IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| KATHLEEN BONNELL, | ) | 8:08CV384 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

In this Social Security appeal, the plaintiff contends that the Commissioner's decision to deny her disability insurance benefits and supplemental security income is contrary to law and not supported by the evidence because the administrative law judge ("ALJ") (1) did not give weight to the opinion of the plaintiff's therapist, a licensed clinical social worker, and (2) failed to examine whether certain testimony provided by a vocational expert ("VE") was inconsistent with the Dictionary of Occupational Titles ("DOT").[1]  After careful review of the administrative record, I find that the Commissioner's decision should be affirmed because (1) the ALJ properly discounted the therapist's opinion and (2) the ALJ's failure to discuss the alleged conflict between the VE's testimony and the DOT was harmless error.

### *I. BACKGROUND*

The plaintiff, Kathleen Bonnell, applied for disability insurance benefits and supplemental security income in August 2004, when she was almost 42 years old. The alleged onset date of her disability is September 15, 2002.

---

[1] The Dictionary of Occupational Titles (4th ed. 1991) is available on the internet at the website of the U.S. Department of Labor, Office of Administrative Law Judges, www.oalj.doj.gov/libdot.htm.

Bonnell's application was denied initially in December 2004, and again on reconsideration in February 2005. At Bonnell's request, an administrative hearing was held on September 20, 2006. Testimony was provided by Bonnell, who was represented by counsel, and by a vocational expert under contract with the Social Security Administration. Two weeks later, on October 4, 2006, the ALJ issued an unfavorable decision finding that although Bonnell has severe mental and physical impairments,[2] and is unable to return to her past work as a legal typist, bartender, or waitress, she is capable of performing light work in other occupations.

Bonnell filed a request for further review, which was granted by the Appeals Council on January 25, 2007. The Appeals Council vacated the hearing decision and remanded the case to the ALJ with directions to evaluate the severity of Bonnell's mental impairments and to develop the record regarding her physical limitations.

Consultative mental and physical exams were obtained, and a supplemental hearing was held before the same ALJ on November 6, 2007. Bonnell, again represented by counsel, testified at the supplemental hearing. Also testifying were a clinical psychologist, who was called as a medical expert ("ME") by the ALJ, and a second vocational expert, also called by the ALJ.

The ME testified that medical records since August 2004 indicate that Bonnell has been diagnosed with major depressive disorder, affective disorder, bipolar disorder, anxiety related disorder, post-traumatic stress disorder, and borderline personality disorder. He opined that Bonnell is moderately limited in activities of daily living, but has a marked limitation in social functioning; she also has a moderate limitation in the area of concentration, persistence and pace. The ME noted that there had been one or two episodes of decompensation, but none since Bonnell started on

---

[2] A medically determinable impairment is "severe" if it significantly limits an individual's physical or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1521.

medication. He concluded that Bonnell could perform unskilled work that is routine and repetitive and that does not require extended concentration or attention to detail, but only if there is no social interaction.

The second vocational expert's testimony is set out at length below, since it is claimed that the ALJ failed to make all of the necessary inquiries:

> BY THE ADMINISTRATIVE LAW JUDGE:
> Q   The first question is for light, unskilled work. If the Claimant could occasionally lift or carry 20 pounds, frequently 10 pounds, no limitation in stand, sit or walk, she could do those for six hours in an eight-hour day; without interruption she could sit, stand or walk for up to three hours, up to eight hours in each day; could occasionally perform postural activities but not work on ladders, ropes, scaffolds and the postural activities would be climbing, balancing, stoop, kneel, crouch, crawl – one moment please. I don't see any basis for her to avoid fumes. She spends a lot of time outside every day and she is a smoker. So that's not a limitation. I am just trying to see if there is any other physical limitation that should be considered. She drives a car. And I said not to work on ladders, ropes or scaffolds. I don't see any basis that she – any reason to restrict her from the cold or heat. So I'm not going to include that as a restriction. Then from a mental standpoint, the residual functional capacity that was discussed with [the ME], that is routine, repetitive, unskilled work. This is work that does not require her to set goals, deal with job changes, very little, if any, interaction with the general public, should work with things rather than people and a job where she doesn't have to work in close proximity to co-workers. Supervisors could give her the instructions but not to be hovering or in constant contact with her. With that functional capacity – I believe at the last hearing we already established the past work was precluded – would you indicate jobs that you feel would be appropriate, if any?
> A   Okay. The hypothetical indicates that she should not work in close proximity to people. I think production work would create that environment. Even though you weren't directly working with people, they would be close to you on the line and you would be working

around a lot of people. So I'm not going to suggest any production type work. Naturally, unskilled cashier, any kind like – thing like that would involve a lot of people interaction. The only thing I can think of where she would be able to get –

    Q    Well, what about cleaning jobs?

    A    That – okay. That's what I'm –

    Q    Okay.

    A    – was going to say. The only thing I can think of where she would be able to get instructions from a supervisor and left to her own device would be cleaning. And housekeeping, cleaning is an unskilled, light job. In Iowa, Nebraska, Missouri and Kansas there are 17,882 of those jobs. In the United States, there are 430,662. There are some unskilled janitor jobs. Although, janitor is classified as semi-skilled, but they are almost the same as the housekeeping cleaning. They would just be different numbers.

    Q    What about food service like salad prep or –

    A    It's –

    Q    – those type of things?

    A    It's very difficult to do food service work and not have some people interaction. You're in an atmosphere where you're around people all the time even when you're a salad maker.

    Q    Animals. I know – when – the Good Will records in here indicate that she was interested in working – doing farm work, animal work. Are there any kind of outdoors or farm jobs that would be appropriate?

    A    Well, let's see. One second. Yes. I can't – it's not listed under groom in here, but there – the description of the job is a groom – they basically work with animals, feed animals, do some grooming and that type of thing.

    Q    Would that be like in a veterinarian's office or –

    A    That would – no. That would be on more like of a ranch or farm kind of setting.

    Q    But would that be light?

    A    Um-hum. Well, no. It wouldn't be light.

    Q    Yeah. We've got to look at –

    A    No. It wouldn't be light. If a person just did some tasks it would be light. The tasks I was thinking of in my head were light, but

no. A person would be prevailed upon to do some heavy, too, medium and heavy.

Q   Well, there was a comment in here that she's going to continue working with animals and new plantings on the acreage where she lives. Is there anything that would involve working with plants?

A   There – let's see, a landscape –

Q   Nurseries –

A   – laborer –

Q   – those kind of things?

A   – is the title for people who work in nurseries. Let's look at that. Both of those groomer situations that I was looking for, they're all – I was going to see if there is something lighter. There isn't. Landscape laborer, that job is classified as heavier than that, too, even though so many of the tasks done are very light routine.

CLMT: Yeah. But it's probably the [INAUDIBLE].

VE: It's –

BY ADMINISTRATIVE LAW JUDGE:

Q   All right. Now, in office work, since she has done her degree in paralegal, are there office jobs that wouldn't involve – where a person could just be filing in the back room or running a photocopy machine or doing data entry, that type of job?

A   There are unskilled office helper jobs, but they're in an environment that's congested with office people and people exchanging information with you.

Q   Okay. So on balance, if you were to look at the full range of unskilled, light or sedentary work, what percent do you feel would be retained that would involve little social interaction?

A   Probably like 20 percent.

Q   And within that category of housekeeper, cleaning, are there various job titles?

A   The – most of the jobs that are unskilled that would pertain to her would be in that housekeeping, cleaner mode. There are different cleaner positions. There are domestic cleaners and that kind of thing, but they're all basically the same.

* * *

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q   That housecleaner job, the one that you gave the numbers for –

5

    A    Yes.
    Q    – what was that DOT?
    A    Okay.  Okay.  323687014.
\* \* \*
    Q    Thank you.  What is – if we're looking at the light, unskilled job base –
    A    Yes.
    Q    – what is the percentage of cleaner jobs?
    A    The percentage of cleaner jobs –
    Q    That makes up the light, unskilled job base.
    A    There is basically one whole category of maids and – who work in motels and cleaning settings that would make up that group.  I don't know.  Anything I would give you would be a guess.
    Q    Okay.  And I'm not talking – and I should make that a little clearer.  I'm not looking for the total number of jobs.  I'm looking at, you know, there is the maid job, the housecleaner, the – if we look at a percentage of those occupations –
    A    Yes.
    Q    – the numbers that appear for those occupations, compared to the light, unskilled base, what is that factor of or a percentage of the unskilled base in your opinion.  Are we looking at five percent of the unskilled base or 10 percent or what are we looking at there?
    A    Probably five percent.
    ATTY:  Okay.  Oh, one last question.
    BY ADMINISTRATIVE LAW JUDGE
    Q    But I thought you said 20 percent before?
    A    No.  I said that – you had indicated what – as per the hypothetical, what percentage of jobs would she be able to perform and I said 20 percent.
    Q    Then you need to give me some other examples if cleaning if [sic] just five percent.
    A    Okay.
    Q    Because that doesn't add up.
    A    No.
    Q    I mean if you want time to do this after the hearing, you can do it after the hearing, too.
    A    Okay.  There are a number of unskilled janitor things that would fall in that category.

Q     Do you have any numbers on these?

A     Sure. Okay. At the light exertional level in Iowa, Nebraska, Missouri and Kansas, there are 11,608 of those.

Q     Nationally how many?

A     Nationally 236,494. I guess a person could function as a carwash attendant. That would be light and unskilled and 3870 of those jobs in that, Iowa, Nebraska, Missouri and Kansas. 74,000 nationally. There are tasks like – that are light and unskilled like an ironer where a person is working in a laundry setting and they give you a group of things to do and give you instructions and leave you and you work alone. In that particular job title, there are 1,697 jobs in Iowa, Nebraska, Missouri and Kansas. There are 49,175 in Nebraska – I mean – excuse me – in the United States. There are 5,611 of those jobs in Iowa, Nebraska, Missouri and Kansas, 101,618 in the United States. Okay. Sales attendant – those kinds of –

Q     I think that's –

A     – things should give you –

Q     – enough. That's enough examples.

A     Okay.

* * *

BY ATTORNEY:

Q     I'm going to ask for the DOTs for those additional ones, please.

A     Okay. Okay. And let's begin with dishwasher, 318687010. The DOT classifies it as medium. The Department of Labor gives us information for light and medium jobs.

Q     Okay. Ironer?

A     Okay. Ironer is 302687010 and that is classified as light and unskilled at an SVP 2. Then did I say carwash attendant?

Q     Yes.

A     915667010.

Q     Okay.

A     And that's light and unskilled.

Q     And, finally, janitor or did I hear that one wrong?

A     Okay. Janitor, 382664010 and that Department of Labor figures show light, unskilled positions for that.

(Tr. 603-611.)

### *A. The ALJ's Findings*

On February 29, 2008, the ALJ issued another unfavorable decision. Among other things, the ALJ found (1) that Bonnell has not engaged in substantial gainful activity since the alleged disability onset date of September 15, 2002; (2) that her severe impairments include: post-traumatic stress disorder; bipolar disorder, not otherwise specified; borderline personality disorder; degenerative disk disease of the lumbar spine; and chronic obstructive pulmonary disease; (3) that these impairments do not meet or equal the listings under 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) that Bonnell has the residual functional capacity ("RFC") to perform light work but is limited to routine, unskilled work that would not involve setting goals, dealing with change, interacting with the general public, working in close proximity to others, or close supervision; and (5) that although Bonnell's restrictions prevent her from performing her past relevant work, considering her age, education, work experience, and RFC, Bonnell remains capable of performing other jobs that exist in significant numbers in the national economy. The ALJ identified these jobs as:

1. Housekeeper/cleaner (DOT 323.687-014) (17,882 in the four-state region of Iowa, Kansas, Missouri, and Nebraska; 403662 jobs in the national economy);

2. Janitor (DOT 382.664-010) (11,608 jobs in the four-state region; 236,494 jobs nationally);

3. Car wash attendant (DOT 915.667-010) (3,870 jobs regionally; 74,000 jobs nationally);

4. Ironer (DOT 302.687-010) (1,697 jobs regionally; 49,175 jobs nationally); and

5. Dishwasher (DOT 318.687-010) (5,611 jobs regionally; 101,618 nationally).

(Tr. 27 (paragraph numbering added).)

In determining RFC at step four, the ALJ declined to give weight to Exhibit 12F, a "medical source statement – mental" form completed by Bonnell's therapist on June 19, 2006, which indicated that Bonnell is markedly limited in her ability to remember locations and work-like procedures; to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances, to work in coordination with or proximity to others without being distracted by them; to complete a normal workday without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; and to travel in unfamiliar places or use public transportation. Bonnell was stated to be moderately limited in all other areas of work-related functions. As defined in the form, "moderately limited" means that the impairment "prohibits that activity or function ⅓ of the time," while "markedly limited" means that the impairment "causes problems in the ability to perform the named activity to the extent that it precludes it." (Tr. 328.) The therapist also opined in the statement that Bonnell's impairments or treatment would cause her to be absent from work more than 4 days per month, and further explained that Bonnell would have difficulty working on a sustained basis because she "has been suicidal in the past and has episodes since of suicidal thinking. On her 'bad' days she is extremely anxious and paranoid – socially it is difficult for her to be in our waiting room for her appointments." (Tr. 330.)

The ALJ summarily rejected the therapist's opinions by stating:

> The undersigned has not given weight to the checklist from Ellen Sitz, LCSW, the claimant's therapist, who opines essentially that the claimant is disabled. (Exhibits 12F, 16F) Ms. Sitz is not an acceptable medical source, and her opinion is not entitled to weight under SSR 06-3p. Her

9

>handwriting is barely legible. There are no opinions from treating psychiatrist Dr. Nadala.

(Tr. 24.) However, in the ALJ's initial decision, which is expressly incorporated by reference into the second decision,[3] the ALJ offered a more complete explanation for not giving weight to the therapist's opinions. She stated:

>The undersigned has not given great weight to the opinion of Ellen Sitz, L.C.S.W., who opined in June 2006 that the claimant is "markedly" limited in 11 of 20 areas of work-related function. Ms. Sitz rated the claimant's then-current GAF as 45 out of a possible 100 and rated her GAF during the past year as 55.[4] Ms. Sitz opined the claimant could be expected to miss more than four days per month of work due to her impairments and treatment. Ms. Sitz' progress notes also are at Exhibit 16F and fail to show limitations that would support her opinion about the severity of the claimant's symptoms. Ms. Sitz' progress notes also are somewhat difficult to decipher. Ms. Sitz indicated on her checklist

---

[3] The second decision states: "First, the reader is directed to the original decision herein affirming the DDS evaluators and finding that claimant could perform a wide range of unskilled light work. See the decision dated October 4, 2006 in the A section of file; it is incorporated by reference as though fully set out herein." (Tr. 20 (underlining in original).)

[4] Global assessment of functioning ("GAF") is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. A GAF of 51 through 60 is characterized by moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). A GAF of 41 through 50 is characterized by serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). A GAF of 31 through 40 is characterized by some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders Text Revision* 32-34 (4th ed. 2000) (DSM-IV-TR).

that she has followed the claimant since September 20, 2004, but Exhibit 16F indicates that until August 2005 the claimant was followed by a Marcie Sikyta, who is identified as a provisional licensed mental health professional. (Exhibit 16F) The undersigned has considered and applied SSR 06-03p in discounting Ms. Sitz' opinion that the claimant essentially is disabled. As contemplated by SSR 06-03p, Ms. Sitz failed to provide relevant evidence to support her opinion and failed to explain her opinion. As in the case of Dr. Kanuri, the checklist format of Ms. Sitz' report reduces its probative value. (Exhibit 12F) The undersigned has generally adopted the conclusions of the State agency consultants regarding the claimant's mental residual functional capacity. As noted earlier, the State agency consultants did not evaluate the claimant's physical residual functional capacity.

At the time of the claimant's intake evaluation in September 2004, Ms. Sikyta rated the claimant's GAF as 40; as of February 2006, Ms. Sitz rated the claimant's GAF as 58, which represents a substantial increase in the claimant's psychological status over a period of about 16 months. (Exhibit 16F)

(Tr. 41.)

## B. Issues on Appeal

Bonnell's request for review of the ALJ's second decision was denied by the Appeals Council on July 8, 2008. This action was timely filed on August 25, 2008, and briefing was completed on May 11, 2009.

Bonnell requests that the ALJ's decision be reversed, and the case remanded for further proceedings, because:

1. The ALJ improperly rejected the therapist's opinions by stating that she "is not an acceptable medical source, and her opinion is not entitled to weight under SSR 06-3p." Bonnell contends that Social Security Ruling

11

>     06-03p requires the ALJ to evaluate and discuss the opinions of all medical sources.

2. The ALJ failed to comply with Social Security Ruling 00-4p by asking the vocational expert whether his testimony conflicted with the DOT, by obtaining a reasonable explanation for any conflict, and by explaining in the decision how the conflict was resolved. In particular, Bonnell claims that the ALJ erred by accepting the VE's testimony that a person with her RFC could work as a janitor or dishwasher.

## *II. DISCUSSION*

A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole. *Hogan v. Apfel*, 239 F.3d 958, 960 (8th Cir. 2001). "Substantial evidence" is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. *Id.*, at 960-61; *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may not be reversed merely because substantial evidence supports a contrary outcome. *See Moad v. Massanari*, 260 F.3d 887, 890 (8th Cir. 2001).

This court must also review the decision of the Commissioner to decide whether the proper legal standard was applied in reaching the result. *Smith v. Sullivan*, 982 F.2d 308, 311 (8th Cir. 1992). Issues of law are reviewed de novo. *Olson ex rel. Estate of Olson v. Apfel*, 170 F.3d 820, 822 (8th Cir. 1999); *Boock v. Shalala*, 48 F.3d 348, 351 n.2 (8th Cir. 1995); *Smith*, 982 F.2d at 311.

The Social Security Administration uses a five-step process to determine whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520 and 416.920.

>At the first step, the claimant must establish that she has not engaged in substantial gainful activity. The second step requires that the claimant prove she has a severe impairment that significantly limits her physical or mental ability to perform basic work activities. If, at the third step, the claimant shows that her impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits. If the claimant cannot carry this burden, however, step four requires that the claimant prove she lacks the residual functional capacity to perform her past relevant work. Finally, if the claimant establishes that she cannot perform her past relevant work, the burden shifts to the Commissioner at the fifth step to prove that there are other jobs in the national economy that the claimant can perform.

Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006). "The RFC is used at both step four and five of the evaluation process, but it is determined at step four, where the burden of proof rests with the claimant." Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." Id. (internal quotations and citations omitted).

### A. Therapist's Opinion

Under the Social Security regulations, licensed clinical social workers are not considered "acceptable medical sources" who can provide evidence to establish the existence of a medically determinable impairment, *see* 20 C.F.R. §§ 404.1513(a) and 416.913(a),[5] but as "other medical sources" their opinions "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-03p, 2006 WL 2329939, *3

---

[5] Also, only "acceptable medical sources" can provide medical opinions or be considered treating sources whose opinions may be entitled to controlling weight. *See* 20 C.F.R. §§ 404.1502, 404.1527(a)(2) & (d), 416.902, and 416.927(a)(2) & (d).

13

(Aug. 9, 2006). "Opinions from 'other medical sources' may reflect the source's judgment about some of the same issues addressed in medical opinions from 'acceptable medical sources,' including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *5.

Factors for considering opinion evidence from "other sources" (both medical and non-medical) include (1) how long the source has known and how frequently the source has seen the individual; (2) how consistent the opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (4) how well the source explains the opinion; (5) whether the source has a specialty or area of expertise related to the individual's impairment(s); and (6) any other factors that tend to support or refute the opinion. *See id.* at *4-5. "Not every factor for weighing opinion evidence will apply in every case. The evaluation of an opinion from a medical source who is not an 'acceptable medical source' depends on the particular facts in each case. Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case." *Id.* at *5.

"The fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source' because . . . 'acceptable medical sources' 'are the most qualified health care professionals.' However, depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an 'acceptable medical source' if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion." *Id.*

14

"Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not 'acceptable medical sources' and from 'non-medical sources' who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id. at \*6*.

While the ALJ's discussion of the therapist's opinion in the second decision was clearly inadequate, the discussion in the first decision satisfied the requirements of SSR 06-03p. The ALJ explained that the therapist had been counseling Bonnell for less than a year when she rendered the opinion, and her progress notes "fail to show limitations that would support her opinion about the severity of the claimant's symptoms." The ALJ noted that the therapist had assessed Bonnell's GAF at 58 in February 2006. The ALJ also noted that the therapist "failed to provide relevant evidence to support her opinion and failed to explain her opinion," which was provided in a checklist format. A medical source statement cannot be discounted "on the basis that the 'evaluation by box category' is deficient *ipso facto*," but where the limitations listed on the form "stand alone" and were not mentioned in treatment records nor supported by any objective testing or reasoning, the statement may be entitled to little or no weight. *See Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005); *Strongson v. Barnhart*, 361 F.3d 1066, 1071 (8th Cir. 2004); *Hogan*, 239 F.3d at 961.

"In determining what weight to give 'other medical evidence,' the ALJ has more discretion and is permitted to consider any inconsistencies found within the record." *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006); *Raney v. Barnhart*,

15

396 F.3d 1007, 1010 (8th Cir. 2005). The ALJ determined to reject the therapist's opinion and to instead accept the opinion of the testifying medical expert, who indicated with respect to the paragraph B criteria of the listings that Bonnell is only moderately limited in activities of daily living and in maintaining concentration, persistence and pace, but is markedly limited in social functioning. In evaluating the ME's testimony, the ALJ stated:

> The undersigned has given weight to the opinion of Dr. Gard, who testified as a medical expert at the hearing. Dr. Gard is an acceptable medical source, his opinion is based on clinical findings, and his opinion is consistent with other medical evidence in the record. The undersigned agrees with and adopts Dr. Gard's testimony concerning the "Part B" and "Part C" criteria set forth above. Dr. Gard's testimony reflects a thorough review of the entire file, and he heard the claimant's testimony at the hearing. Dr. Gard opined that the claimant could perform routine, repetitive work with no social interaction. He stated that she could work with things but could not interact with the general public, could not work around co-workers, and could tolerate only infrequent interaction with supervisors. Dr. Gard stated that the claimant's low ratings with regard to her Global Assessment of Functioning ("GAF") reflect her marked limitation in the area of social interaction.

(Tr. 25.)

     I cannot say that the ALJ's decision in this regard was in error. The ALJ may have inartfully implied in the second decision that the therapist's opinion was rejected solely because she was not an acceptable medical source, but it is apparent from the original decision, which was incorporated by reference into the second decision, that the ALJ properly applied SSR 06-03p in evaluating the therapist's opinion. An arguable deficiency in the ALJ's opinion-writing technique does not require the court to set aside an administrative finding when that deficiency had no bearing on the outcome. See *Owen v. Astrue*, 551 F.3d 792, 801 (8th Cir. 2008).

## *B. Vocational Evidence*

Once it has been determined that the claimant's RFC does not permit her to perform her past relevant employment, the issue at step five is whether the claimant is able to perform other work in the national economy in view of her age, education, and work experience. *Harris v. Barnhart*, 356 F.3d 926, 929 (8th Cir. 2004). Generally, if the claimant suffers from nonexertional impairments that limit her ability to perform the full range of work described in one of the specific categories set forth in the medical-vocational guidelines, the ALJ is required to utilize testimony of a vocational expert. *Draper v. Barnhart*, 425 F.3d 1127, 1132 (8th Cir. 2005).

Social Security Ruling 00-4p specifies that "[w]hen a VE or VS [6] provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT. . . . If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict. . . . When vocational evidence provided by a VE or VS is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified." SSR 00-4p, 2000 WL 1898704, *4 (Dec. 4, 2000).

In the present case, the ALJ neglected at the supplemental hearing to ask the VE whether his evidence conflicted with information provided in the DOT, and therefore failed to comply with SSR 00-4p. However, the Court of Appeals has held

---

[6] A "VS" is a vocational specialist, who provides evidence to a disability determination services adjudicator, as distinguished from a VE, who provides evidence at a hearing before an ALJ.

that such an error is harmless if no conflict existed, *see Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007), which the Commissioner contends is the situation here. Bonnell argues that the VE's testimony concerning her ability to work as a janitor and a dishwasher is inconsistent with the DOT, because both jobs are classified as medium in exertional requirements.

The VE testified that the DOT classifies dishwasher as medium work, but "[t]he Department of Labor gives us information for light and medium jobs." (Tr. 611.) The VE also testified that "Department of Labor figures show light, unskilled positions for [janitor]." (Tr. 611.) Although not entirely clear from the testimony, it appears that the job figures provided by the VE were only for light-duty dishwasher and janitor positions. "The DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings. A VE, VS, or other reliable source of occupational information may be able to provide more specific information about jobs or occupations than the DOT." SSR 00-4p, 2000 WL 1898704 at *3.

Even if the VE's testimony concerning the jobs of dishwasher and janitor conflicted with the DOT, he provided job numbers for three other occupations which are classified as light work and which exist in significant numbers in the national and regional economies. The VE also expressed the opinion that for the full range of unskilled, light and sedentary jobs, 20 percent involve little social interaction, and could be performed by a person with Bonnell's mental limitations. Because of this additional evidence, any error that may have been committed by the ALJ in accepting the VE's testimony about janitors and dishwashers was harmless error.

### III. CONCLUSION

For the reasons stated, I find that the Commissioner's decision is supported by substantial evidence on the record as a whole and is not contrary to law.

Accordingly,

IT IS ORDERED that the decision of the Commissioner is affirmed pursuant to sentence four of 42 U.S.C. § 405(g). Final judgment will be entered by separate document.

June 8, 2009.	BY THE COURT:

	s/ *Richard G. Kopf*
	United States District Judge